UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Wade Alrick Johnson, Jr.,

        Plaintiff,

        v.                             Civil Action No. 1:10-CV-299

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

## **REPORT AND RECOMMENDATION**
(Docs. 12, 16)

Plaintiff Wade Alrick Johnson brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Johnson's motion to reverse the Commissioner's decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 16). For the reasons stated below, I recommend that Johnson's motion be DENIED, and the Commissioner's motion be GRANTED.

## **Background**

Johnson was twenty-three years old on the alleged disability onset date of May 17, 2005. (Administrative Record ("AR") 45, 229, 255.) He did not graduate from high school, completing school only through the eleventh grade. (AR 45, 329, 361, 399, 547, 1033.) He attended one year of a culinary arts program, and in more recent years has unsuccessfully attempted to earn a General Equivalency Diploma ("GED"). (AR 45-47,

330, 1032-33.)  Johnson has work experience as a spray painter, a gas station attendant, a supermarket stock clerk, a housekeeper, a line cook, a maintenance worker, an insulation installer, and a machine operator.  (AR 86-88, 248, 285, 399.)  He lives with his wife and six-year old son, and has been the primary caretaker for his son while his wife has worked.  (AR 44, 47, 67-68, 1030, 1046.)

In May 2005, Johnson suffered a workplace injury which he claims caused or exacerbated chronic back pain.  (AR 51-52, 449, 1035.)  He also suffers from an ankle injury and a shoulder injury, and has migraine headaches and memory problems stemming from an April 2004 car accident.  (AR 47-48, 66-67, 69-70, 74-75, 449, 1037-38.)  In addition to his physical injuries, Johnson has had lifelong problems with depression and anxiety, as well as difficulty controlling his temper, and has been diagnosed with chronic adjustment disorder with anxious and depressed mood.  (AR 53, 74.)

In May 2007, Johnson filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  (AR 229-41.)  Pursuant to the DIB application, he alleges that, starting on May 17, 2005, the date of the above-mentioned workplace injury, he became unable to work as a result of back pain, shoulder pain, paresthesia in his right arm, migraine headaches, depression, and anxiety.  (AR 48-49, 56, 247-48, 1047.)  The application was denied initially and by a Federal Reviewing Official. (AR 97-108.)  On July 9, 2009, Administrative Law Judge ("ALJ") Robert Klingebiel conducted a hearing on the application, and soon thereafter, issued a decision finding that Johnson was not disabled.  (AR 109-20, 1025-50.)  The Decision Review Board ("DRB")

selected the case for review, and remanded the matter to the ALJ for further proceedings

and a new decision.  (AR 123-25.)  On June 2, 2010, ALJ Klingebiel held a second

hearing on the application, issuing a new decision on July 22, 2010, once again finding

that Johnson was not disabled.  (AR 17-30, 38-96.)  Thereafter, the DRB affirmed the

ALJ's decision, making it final.  (AR 1-4.)  Having exhausted his administrative

remedies, Johnson filed the Complaint in this action on December 8, 2010.  (*See* Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to

consider whether the claimant's "residual functional capacity" ("RFC") precludes the

performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The

fifth and final step requires the ALJ to determine whether the claimant can do "any other

work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving

his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

Employing this sequential analysis, ALJ Klingebiel first determined that, although

Johnson worked after the alleged disability onset date, this work constituted an

"unsuccessful work attempt," and thus Johnson had not engaged in substantial gainful

activity since his alleged onset date of May 17, 2005.  (AR 19.)  At step two, the ALJ

found that Johnson had the severe impairments of adjustment disorder with anxiety and

depression, degenerative disc disease, migraine headaches, and "status post arthroscopic

right shoulder surgery with intermittent paresthesia."  (AR 20.)  At step three, the ALJ

found that none of Johnson's impairments, individually or in combination, met or

medically equaled a listed impairment.  (AR 20-24.)

Next, the ALJ determined Johnson's RFC, finding that he was able to perform

light work, except the work had to be unskilled, and Johnson could only occasionally lift

twenty pounds or more, could sit for only six hours in an eight-hour workday, and could

stand or walk for only three-to-four hours in an eight-hour workday.  (AR 24.)

Additionally, the ALJ found that, when sitting, Johnson would have to "periodically

alternate between sitting and standing by briefly stretching every 30 to 60 minutes."  (*Id.*)

Based on this RFC and other vocational characteristics, at step four, the ALJ concluded that Johnson was unable to perform his past relevant work as a stock clerk, laundry laborer, cleaner, fast food cook, kitchen helper, machine operator, machine sander, spray painter, "installation installer", and automobile service station attendant.  (AR 28.) Finally, at step five, relying on the testimony of Vocational Expert ("VE") John F. Bopp, the ALJ determined that Johnson could perform other work existing in significant numbers in the national economy, including the jobs of cashier, security gate guard, food checker/cafeteria cashier, office sorter, and collator/operator.  (AR 29-30.)  The ALJ concluded that Johnson had not been under a disability from May 17, 2005, the alleged onset date, through the date of the decision.  (AR 30.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial

evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

**I.     The ALJ's Allocation of Weight among the Opinions of Medical Providers and Consultants Was Proper.**

Johnson contends that the ALJ erred in his allocation of weight among the opinions of medical providers and consultants.  But, as discussed below, the ALJ's decision contains extensive discussion and analysis of the medical opinions (*see* AR 20-23, 25-28), and substantial evidence supports the weight afforded thereto.  This is a case involving many medical opinions, provided by both treating and consulting providers, some supporting a finding of disability and some not.  Accordingly, I am especially mindful that the ALJ's decision must be affirmed if supported by substantial evidence, even if a contrary outcome is also supported by substantial evidence.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed us that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive.  We would be derelict in our duties if we simply paid lip service to this rule, while shaping our holding to conform to our own interpretation of the evidence.") (citations omitted).  The medical opinions at issue in Johnson's moving brief are discussed below.

**A.     Maureen Boardman, APRN**

The ALJ gave limited weight to the opinion of Maureen Boardman, APRN, who indicated that Johnson was able to sit for only four-to-five hours and stand and walk for

only two-to-three hours in an eight-hour workday.  (AR 1016.)  Boardman further opined

that Johnson could only occasionally reach with his right arm and operate foot controls

with his right foot.  (AR 1017.)  She also opined that Johnson would miss "about 4 days"

of work each month during the alleged disability period as a result of his impairments,

including depression, migraine headaches, insomnia, degenerative disc disease, and lower

back pain.  (AR 1024.)  Johnson contends that the ALJ should have given Boardman's

opinion great weight because, among other things, Boardman treated Johnson frequently,

conducted thorough examinations of Johnson at each visit, made notes containing

objective test results, considered medical records from specialists, and referred Johnson

to numerous specialists.  (Doc. 12 at 9-10.)

     As a nurse and not a licensed physician or psychologist, Boardman is not an

"acceptable medical source," and thus the treating physician rule does not apply to her

opinion.  20 C.F.R. § 416.913(a).  Nonetheless, the Social Security Administration has

determined that opinions from sources other than "acceptable medical sources" are

"important" and "should be evaluated on key issues such as impairment severity and

functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 2006

WL 2329939, at *3 (2006).  Thus, while the ALJ was free to conclude that Boardman's

opinion was not entitled to any weight, or was entitled to only minimal weight, he was

required to explain that decision.  *See Marziliano v. Sullivan*, 771 F. Supp. 69, 75

(S.D.N.Y. 1991) (holding that opinion of "other source" is entitled to "some

consideration").

In fact, the ALJ did explain his decision to afford limited weight to Boardman's opinion.  First, the ALJ explicitly described, in summary fashion, Boardman's treatment notes and opinions regarding Johnson's shoulder problems, back pain, and headaches. (AR 20.)  Second, the ALJ indicated that he was aware that Boardman was one of Johnson's treating providers, referring to her as "the claimant's treating source."  (AR 27.)  Third, the ALJ correctly noted that Boardman's finding that Johnson exhibited pain with straight leg raising was inconsistent with the findings of "multiple acceptable medical sources."  (AR 27; *see, e.g.,* AR 419, 541.)  Most importantly, the ALJ's decision not to give great weight to Boardman's opinion is supported by the opinions of other medical providers and consultants, as discussed below, as well as by Johnson's own testimony and statements to medical providers.  For example, Johnson testified at the administrative hearing or told medical providers during office visits that he played softball[1] and whiffle ball (AR 439, 466, 484, 488, 777), did carpentry work (AR 59, 442, 466), moved four households (AR 466, 484), and provided primary care for his preschool-aged son (AR 47, 848, 1045) during the alleged disability period, activities which Boardman's opinion would have precluded.

### B.     Jessica Gentry, M.A.

Johnson also contends that the ALJ should have given more weight to the opinion of Jessica Gentry, M.A.  As with Nurse Boardman, because Gentry is a mental health counselor and not a licensed physician or psychologist, she is not an "acceptable medical

---

[1] Johnson challenges the ALJ's finding that he played softball during the alleged disability period, claiming that he merely *coached* softball during that period.  This issue is addressed in detail below.

source," and thus the treating physician rule does not apply to her opinion.  20 C.F.R. §
416.913(a).  Nonetheless, because she had a treating relationship with Johnson, the ALJ
should have evaluated her opinion "on key issues such as impairment severity and
functional effects, along with the other relevant evidence in the file."  SSR 06-03p, at *3.
The ALJ did so, first summarizing Gentry's relevant treatment notes and opinions, next
noting that she was "not considered an acceptable medical source," and finally affording
only "some weight" to her opinions for the stated reasons that (1) "[m]any of [her]
treatment notes are simple recitations of the claimant's alleged symptoms," and (2) "she
provides no laboratory findings or diagnostic test results to back up her findings."  (AR
22.)  The record supports these findings (*see, e.g.,* AR 856-66, 1012-13), and does not
reflect that Gentry conducted any formal or informal tests to support her assessments.

Moreover, Gentry did not begin meeting with Johnson until June 2009 (AR 1021),
over four years after the alleged disability onset date of May 17, 2005.  And Gentry's
May 2010 opinion explicitly applies only to about a one-year period, as she signed the
opinion on May 6, 2010 and stated therein that Johnson's limitations were first present on
"6/5/09."  (AR 1013.)  Furthermore, Gentry's May 2010 opinion is internally inconsistent
and also inconsistent with other medical evidence.  For example, in that opinion, she
assessed Johnson as having "marked" restrictions in carrying out *simple* instructions,
while at the same time having only "moderate" restrictions in carrying out *complex*
instructions.  (AR 1012.)  Not only are these assessments internally inconsistent, but they
are also inconsistent with the opinions of Johnson's other medical providers.
Specifically, after administering an array of tests to Johnson, Dr. Richard Root opined

based on the results thereof that Johnson's intellectual ability and memory were "in the average range . . . or above" (AR 558), which would presumably mean that he was able to carry out simple instructions.

Another of Gentry's opinions which is inconsistent with the opinions of other medical providers is her assessment that Johnson had "marked" restrictions in making judgments on both simple and complex work-related decisions. (AR 1012.) As noted above, Johnson himself testified that he is the primary caregiver for his son (AR 47, 1045), which would seem to require the ability to make judgments on simple matters, including matters which could be described as "work-related." Further, reports from other providers, including Dr. Edward Orecchio and Dr. Jesse Ritvo for example, indicate that Johnson's judgment was "fair" and "intact." (AR 552, 868.)

Gentry also assessed Johnson as having moderate-to-marked limitations in interacting with others. (AR 1013.) But in mental status examinations, Johnson was described as being "cooperative," "pleasant," "appropriate," and "friendly" (AR 383, 545, 552, 867, 868); he reported considering obtaining a job out of the home "for more socialization" (AR 849); and he told Gentry that he "often seeks others' company . . . to ease anxiety" (AR 753). Additionally, Johnson was able to work with a tutor toward obtaining his GED (AR 364); and, as noted earlier, he was able to engage in some work activity (AR 442, 464, 467), play on a softball team (AR 439, 466, 484, 488), help others move (AR 484), have friends (AR 1045), and socialize on weekends (AR 1049). All of this social activity supports the ALJ's decision to afford only "some weight" to Gentry's opinion regarding Johnson's ability to interact with others.

### C.     Dr. Cynthia Short

The ALJ afforded "great weight" to the opinion of agency consultant Dr. Cynthia

Short (AR 27), who assessed Johnson in August 2007 as having a physical functional

capacity for a limited range of light work and opined that Johnson's allegations,

particularly with respect to his walking limitations, were only "partially credible" (AR

507-08).  The ALJ defended his decision to give great weight to Dr. Short's opinion by

accurately stating that there is no substantial medical evidence from "acceptable medical

sources" which contradicts Dr. Short's findings (AR 28); and by noting that Dr. Short's

finding that Johnson's allegations were only partially credible was supported by other

evidence, medical and non-medical, as described in detail in the ALJ's decision (AR 27,

28).

Citing Social Security Ruling ("SSR") 96-6p, Johnson argues that "Dr. Short's

opinion cannot 'trump' that of Nurse Boardman" because Dr. Short was merely an

agency consultant while Boardman was a treating provider.  (Doc. 12 at 16.)  However,

SSR 96-6p clearly permits ALJs to give more weight to the opinions of non-examining

agency consultants than to the opinions of treating sources, when the former are

supported by evidence in the record and the latter are not.  *See* SSR 96-6p, 1996 WL

374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . .

consultants . . . may be entitled to greater weight than the opinions of treating or

examining sources."); *see also* 20 C.F.R. § 404.1527(f)(2)(ii) ("State agency . . .

psychological consultants . . . are highly qualified . . . medical specialists who are also

experts in Social Security disability evaluation . . . .").  Dr. Short's opinions are supported

12

by the opinions of other medical sources.  For example, Dr. Short's August 2007 opinion

regarding Johnson's physical limitations is supported by Dr. Daniel Wing's March 2008

assessment, discussed in the ALJ's decision (*see* AR 27), which included findings that

Johnson's range of motion was "within normal limits"; Johnson no longer had radiculitis;

and Johnson was recommended to attend additional vocational rehabilitation in order to

"get the kind of job he wants in which he could have the freedom to sit or stand."  (AR

542-43.)  Dr. Short's opinion is also supported by Johnson's July 2009 testimony stating

that he successfully completed a functional restoration program in January 2008, was

released to work thereafter, and planned on attending vocational retraining as a welder,

an occupation that he and his rehabilitation counselor "thought . . . [he] should be able to

do."  (AR 1040-41.)  Additionally, Dr. Short's opinion is supported by the September

2007 treatment notes of Dr. William Abdu, an orthopedic surgeon at Dartmouth

Hitchcock.[2]  Those notes, which are explicitly referenced in the ALJ's decision (*see* AR

27), indicate that Johnson's symptoms "appear to be magnified out of proportion to [MRI

results]" (AR 421).  Furthermore, the opinions of Drs. Charles Pappas and Robert

Johnson, also discussed in the ALJ's decision (*see* AR 28), support Dr. Short's opinion,

in that they find that (a) results from an April 2010 MRI of Johnson's shoulder were

"unremarkable" and revealed only "mild" tendinosis and a "strain" (AR 800), and (b)

results from a March 2010 x-ray of Johnson's shoulder revealed "no fracture" and "[n]o

---

[2]  The ALJ in his decision and Johnson in his motion, erroneously attribute this opinion to Dr.
Wayne McGough.  (*Compare* AR 27 and Doc. 12 at 8 *with* AR 421.)  The ALJ's error is harmless,
however, as the record reveals that Drs. McGough and Abdu both examined Johnson at the same time
("in conjunction" (AR 420)) on September 11, 2007, resulting in separate opinions, one dictated by Dr.
Abdu and the other dictated by Dr. McGough, both making essentially the same observations and
opinions.  (AR 419-21.)

bony abnormality" (AR 801).

Johnson points out that the ALJ erroneously characterized Dr. Short as an examining physician. (Doc. 12 at 15-16.) In fact, the ALJ stated as follows: "During Dr. Short's examination of the claimant, . . . ." (AR 27-28.) Therefore, Johnson's point is well-taken. However, it is reasonable to assume that this misstatement was merely a drafting error. Dr. Short's opinions were provided on a form routinely used by non-examining agency consultants (Form SSA-4734-BK, titled "Physical Residual Functional Capacity Assessment"), including Dr. Short. But more importantly, and as discussed above, the ALJ's justification for the weight he afforded to Dr. Short's opinion was not based on a finding that Dr. Short was an examining physician. (*See* AR 27-28.) Also noteworthy, the ALJ did not afford Dr. Short's opinion "controlling weight," which he might have (rather than affording the opinion merely "great weight"), had he thought Dr. Short was an examining physician.

### D.    Dr. Edward Hurley

The ALJ also afforded "great weight" to the opinion of agency consultant Dr. Edward Hurley (AR 22), who opined in October 2007 that, although the record demonstrated that Johnson had a history of depression, it was "currently controlled by med[ications] and [did] not result[] in significant functional limitations" (AR 527). The ALJ properly supported his decision to afford great weight to this opinion by stating as follows: "I give Dr. Hurley's opinion great weight because it is consistent with the opinions of Dr. Hoffnung and Dr. Root . . . and is not contradicted by any acceptable medical sources . . . ." (AR 22.) First, the record supports the ALJ's finding that Dr.

14

Hurley's opinion regarding Johnson's functional limitations due to mental impairments is not contradicted by any "acceptable medical source."  To the extent Johnson argues that the ALJ's statement is inaccurate because Dr. Hurley's opinion is contradicted by the opinions of Nurse Boardman or counselor Gentry, the argument fails because neither Boardman nor Gentry is an "acceptable medical sources," as discussed above.  *See* SSR 06-03p at *1-2.

Second, the record supports the ALJ's finding that Dr. Hurley's opinion is consistent with the opinions of Drs. Priscilla Hoffnung and Richard Root.  Specifically, medical expert Dr. Hoffnung, whose opinion is discussed in detail below, reviewed the record and testified in June 2010 that Johnson's prescribed psychiatric medication "was effective" at treating Johnson's anxiety and depression, which had both "been fine and decreased."  (AR 74.)  Moreover, in April 2009, Dr. Root opined that Johnson's intellectual ability and memory were in the average range, and assessed Johnson with a Global Assessment of Functioning ("GAF") rating as high as sixty, placing Johnson at the highest level of the GAF category indicating moderate symptoms and on the cusp of the category indicating only mild symptoms.[3]  (AR 558, 559.)  Other medical sources similarly assessed Johnson as having GAF ratings of sixty or higher during the alleged disability period.  (*See, e.g.,* AR 754, 868.)  Although GAF scores in and of themselves

---

[3]  A score of sixty would place Johnson in the category of "51-60," which indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).  A score of higher than sixty would indicate "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, [and having] some meaningful interpersonal relationships."  *Id.* at 34.

do not demonstrate that an impairment significantly interferes with a claimant's ability to work, they are "one factor" to consider in determining an individual's ability to perform substantial gainful activity. *Parker v. Astrue*, No. 2:10-cv-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (citation omitted).

### E.    Drs. Daniel Wing, Billy McGough, and William Abdu

The ALJ also gave "great weight" to the opinions of Drs. Daniel Wing, Billy McGough, and William Abdu.  (AR 27.)  As mentioned earlier, Dr. Wing opined in March 2008 that Johnson's back condition had improved markedly, and that Johnson would benefit from vocational rehabilitation.  (AR 542-43.)  Statements from Johnson himself support the former opinion: as discussed earlier, in a form updating his status to the Social Security Administration in May 2008, Johnson stated that he had "improved" since participating in a functional restoration program in January 2008, resulting in him being "more mobile and physically active" and "participat[ing] more in recreational and daily activities."  (AR 311.)  Johnson further stated that his conditions did not affect his ability to care for his personal needs "at all," and that he was able to play with his son more and "do some housework."  (AR 314.)  Also supportive of Dr. Wing's opinion are the September 2007 records of Drs. McGough and Abdu, also discussed earlier, which recommended that Johnson attend a functional restoration program and opined that, although an MRI indicated some degenerative changes, there was no evidence of nerve root compression and Johnson's symptoms were magnified out of proportion compared to his MRI and normal neurological examination.  (AR 420-21.)

Johnson contends that the ALJ should not have given great weight to these opinions, principally because Drs. Wing, McGough, and Abdu saw Johnson on only one occasion, respectively, and they were unaware that Johnson's pain increased in the winter of 2008-2009.  (Doc. 12 at 8.)  Johnson further claims that the opinions of these providers are only "snapshots" of him at particular time periods and are not reflective of his condition throughout the alleged disability period.  (*Id.*)  After reviewing the record, I disagree, and find that substantial evidence (much of it discussed above and in the ALJ's decision) demonstrates that these providers' opinions are in fact reflective of Johnson's condition during the majority of the alleged disability period.  (*See, e.g.,* AR 74-78, 314, 330, 439-40, 442-43, 451-52, 464, 466, 468, 484, 488, 532, 536-38, 558-60, 754-55, 777, 800-01, 816, 867-68.)  ALJs are entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians," *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987), and that is precisely what the ALJ did in this case (*see, e.g.,* AR 22 ("I give Dr. Hurley's opinion great weight because it is consistent with the opinions of Dr. Hoffnung and Dr. Root . . . ."); AR 23 ("It is based on the opinions of the acceptable medical sources in the record, Dr. Hoffnung, Dr. Hurley, Dr. Ritvo, and Dr. Root, that I find that the claimant is not more than moderately limited in th[e] area [of maintaining concentration, persistence, or pace."); AR 23 ("I find based on the testimony of Dr. Hoffnung and the opinion of Dr. Hurley that the claimant has experienced no episodes of decompensation."); AR 27 ("Dr. McGough's opinion is validated by the findings of Dr. Short.")).  As stated by the Commissioner, "[w]here repeated 'snapshots' from several acceptable medical sources reasonably point to the

same conclusion, the ALJ may give great weight to such assessments."  (Doc. 16 at 14.)

### F.      Dr. Priscilla Hoffnung

Finally, Johnson contends that the ALJ should have given less weight to the

opinion of psychologist Dr. Priscilla Hoffnung.  (*See* Doc. 12 at 16.)  As noted earlier,

Dr. Hoffnung reviewed the record and testified as a medical advisor at the June 2010

administrative hearing regarding her opinions on Johnson's functional limitations during

the alleged disability period.  (*See* AR 73-84.)  Specifically, Dr. Hoffnung opined that the

medical record reflected that Johnson's psychiatric medication was effective in treating

his anxiety and depression (AR 74); that Dr. Root's April 2009 neurological assessment

did not indicate severe memory problems that would limit functioning (AR 75); that

Johnson's impairments did not meet or equal the severity requirements of any listed

impairment (AR 76); and that Johnson would be only mildly limited in activities of daily

living and social functioning, moderately limited in concentration, persistence, and pace,

and had no episodes of decompensation (AR 77).  Dr. Hoffnung further noted that

Johnson's moderate limitations in concentration, persistence, and pace had not impacted

his ability to work after the 2004 car accident which allegedly caused his memory

difficulties, as evidenced by the fact that "he was employed [after the accident] until he

suffered a work injury in May 2005."[4]  (AR 78.)

The ALJ gave "substantial weight" to Dr. Hoffnung's opinion "because she had

the opportunity to review all of the medical evidence of record . . . and her opinion is

---

[4]   The record does in fact reflect that Johnson did not stop working until approximately May 2005, and even then, he stopped due to a back injury not any mental limitations.  (AR 449.)  Moreover, at a September 2005 medical appointment, Johnson told Dr. Peter Frazer that his head injuries arising from the 2004 car accident were "completely resolved except for some occasional residual headaches."  (*Id.*)

consistent with the other medical evidence submitted by acceptable medical sources."

(AR 22.)  Based on my review of the record, I agree that Dr. Hoffnung's opinions are

consistent with substantial other medical evidence, as discussed above.  For example, Dr.

Hoffnung's opinion that Johnson's anxiety and depression was being effectively treated

with medication is supported by an August 2009 medical report prepared by counselor

Gentry which notes that Johnson took medication for his anxiety and depression from

"2001-2004"; that the medication was "very helpful"; and that he had "not taken any

psychotropic medications since 2004" because he "'just didn't need them.'"  (AR 856

(quoting Johnson).)  Although he was asking for medication for his depression and

anxiety at that time, mainly to address his "irritability," the record demonstrates that there

was approximately a five-year period, four of those years falling within the alleged

disability period, where Johnson did not take medication for his depression and anxiety.

(*Id.*)  Moreover, shortly after restarting medication (at a lower dose than previously

taken), in August 2009, Johnson reported to Dr. Ritvo that he was receiving "some

benefit" from the medication, and Dr. Ritvo found an essentially unremarkable mental

status examination and assessed a GAF rating of sixty, which indicates only mild-to-

moderate symptoms, as discussed above.  (AR 868.)  Approximately five months later, in

January 2010, Johnson reported to Dr. Ritvo that he "ha[d] not been depressed recently

and his anxiety ha[d] been 'fine.'"  (AR 867.)

     In sum, Dr. Hoffnung is an acceptable medical source who reviewed the entire

record and testified (and was cross-examined) at the administrative hearing.  Her opinion

is supported by the evidence, including other medical opinion evidence, as stated in the

ALJ's decision.  Therefore, the ALJ was entitled to afford great weight to Dr. Hoffnung's opinion.  Furthermore, as explained above, it is clear from the ALJ's decision that he reviewed and considered the opinions of each medical provider and consultant whose treatment or evaluation of Johnson is materially relevant to Johnson's disability application.  Johnson asks the Court to engage in a reweighing of this evidence, which I decline to do.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (agency's decision affirmed where there was substantial evidence for both sides).

## II.  The ALJ's RFC Determination Is Supported by Substantial Evidence, and the ALJ Did Not Err in Failing to Include Non-Exertional Limitations.

Johnson argues that the ALJ's RFC determination should have included his non-exertional limitations, including his "impairments in concentration caused by chronic pain, migraine headaches[,] and side effects of narcotics."  (Doc. 12 at 20-21.)  First, the ALJ's limitation of Johnson to "unskilled work," both in his RFC determination (AR 24) and in his hypothetical to the VE (AR 89), recognized that Johnson had some limitations with respect to understanding and carrying out instructions, and maintaining concentration, persistence, and pace (*see* AR 22-23).  "Unskilled work" is defined as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember *simple* instructions; to respond appropriately to supervision, coworkers, and *usual* work situations; and to deal with changes in a *routine* work setting.

SSR 85-15, 1985 WL 56857, at *4 (1985) (emphases added) ("losses of intellectual and emotional capacities are generally more serious when the job is complex").  The opinions

of Nurse Boardman and counselor Gentry constitute the only medical evidence which

arguably opines that Johnson was unable to do "unskilled" work.  As explained above,

however, the ALJ's decision not to accept these opinions was proper.

Second, the record simply does not support Johnson's contention that his ability to

work was limited by side effects he experienced from medication.  Although Nurse

Boardman checked off a box stating that "side effects of [Johnson's] medications [would]

have interfered with his concentration, alertness or mental focus," and indicating that

"Percocet" was the medication causing the side effects, she failed to give a response to a

question inquiring about what the side effects were.  (AR 1024.)  Furthermore, despite

making this opinion, in a separate document, Boardman opined that Johnson was able to

"follow written/verbal directions" (AR 1022), which would suggest that she did not

believe the medication side effects felt by Johnson were so severe that he could not

concentrate enough to perform unskilled work.  Also noteworthy, at least on one medical

form, Boardman limited her opinion that Johnson's "mental health" issues impaired his

ability to work, to a "3-6 month[]" period (AR 1022), which does not meet the durational

requirements of the Social Security Act.  *See* 42 U.S.C. § 423(d)(1)(A); *Barnhart v.*

*Walton*, 535 U.S. 212 (2002).

Third, with respect to Johnson's migraine headaches, the ALJ accurately noted in

his decision that Johnson testified at the July 2009 hearing that "the prescription drug

Imitrex control[led them]," although he could not always afford the medication, and that

"the medication Atenolol decrease[d] his headaches to one per week."  (AR 26 (citing

AR 655); *see* AR 1038, 1043.)  Johnson points out that Nurse Boardman "signed forms . .

21

. stating [that Johnson] could not work for 3 to 6 month periods in 2009 and 2010 due to migraine headaches." (Doc. 12 at 21.)  As stated above, however, a three-to-six-month period does not meet the durational requirements of the Social Security Act.  Moreover, Boardman fails to explain or support her belief that Johnson's migraine headaches would prevent him from working for that time period.  (AR 1022.)

Johnson contends that the ALJ's finding that medication suitably controlled his migraine headaches is not based on substantial evidence, and that in fact, Johnson testified that he could function with a migraine headache only if he took his medication *at the right time*, which did not always happen.  (Doc. 19 at 9 (citing AR 1043).)  But Johnson was specifically asked at the July 2009 hearing how often he did not take his medication at the right time, and he stated: "It doesn't usually happen.  It's happened a couple of times." (AR 1044.)  When Johnson was again asked at the hearing "[a]bout how often" he thought he had migraines for which he did not take his pills on time, he stated, "I'm not sure."  (*Id.*)  Summarizing this testimony, according to Johnson himself, he rarely neglected to take his headache medication on time, and there were only "a couple of times" when he could not take his medication at the right time.  (AR 1044.)

The record does not reasonably reflect that Johnson consistently had migraine headaches of such severity to preclude work.  In fact, in many of Johnson's medical appointments and on multiple Social Security Administration forms, there is no mention of Johnson's allegedly disabling headaches.  (*See, e.g.,* AR 247, 278-84, 298, 311, 419, 435, 446, 454, 497, 503-04, 529, 540-41, 589, 595, 628, 630, 632.)  The ALJ was entitled to consider this lack of evidence.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.

1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say.").  The record reflects that, although there were times that Johnson's migraine headaches increased in severity and frequency, in general, they did not pose a significant problem and did not require regular treatment until late 2008 to 2009, at which time Johnson was able to adequately manage them with medication.  A symptom that can be reasonably controlled by medication or treatment is not disabling.  *Dumas*, 712 F.2d at 1553 ("a remediable impairment is not disabling").

Johnson also contends that the ALJ should have taken into account his right shoulder injury when determining his RFC.  The ALJ did in fact note that Johnson had arthroscopic surgery on his right shoulder, and that Nurse Boardman opined that Johnson could only occasionally reach as a result of his shoulder problems.  (AR 20.)  However, the ALJ gave minimal weight to Boardman's opinion, noting later in his decision that an August 2009 record indicated that Johnson "threw a wiffle ball as hard as he could."  (AR 26.)  The ALJ sensibly stated: "If the claimant's impairments were truly disabling then it would likely not be possible for him to take part in a game of wiffle ball."  (*Id.*)  More importantly, the ALJ also considered evidence from Dr. Pappas, who found "unremarkable" results from an MRI of Johnson's shoulder (AR 28, 800), and Dr. Johnson, who found that x-rays of Johnson's shoulder showed "no fracture or other significant bony abnormality" (AR 28, 801).  In any event, the VE testified that the jobs of security gate guard and office sorter, cited by the ALJ at step five as jobs existing in significant numbers in the national economy that Johnson could perform (AR 29), could be performed with only occasional use of the right arm (AR 95).  Therefore, the ALJ's

omission of a shoulder limitation in Johnson's RFC was, at most, harmless error.

III.    **The ALJ's Credibility Determination Is Supported by Substantial Evidence.**

Lastly, Johnson contends that the ALJ's determination that Johnson was not fully credible is not based on substantial evidence.  It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Thus, if the Commissioner's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  These reasons "must be grounded in the evidence and articulated in the determination or decision."  *Id.*

In this case, the ALJ explicitly considered the extensive case record and gave specific reasons for his determination that Johnson's subjective complaints were not entirely credible.  For example, the ALJ correctly stated that, although Johnson alleged that his wife was required to take care of their son, the testimony of both Johnson and his wife at the June 2010 hearing was to the contrary.  (AR 25; *see* AR 47, 1045.)  The ALJ also correctly stated that Johnson's allegations about difficulty sleeping were not entirely credible, given that the record contains several medical notes documenting Johnson's reporting to medical providers that he had been sleeping "fine."  (AR 25; *see* AR 540,

24

856, 867.) Further, the ALJ stated that, although Johnson alleged that he suffered

"frequent flashbacks" to his April 2004 automobile accident, "curiously, [he] testified

that he had never brought up the issue of flashbacks to his counselor, Jessica Gentry . . .

." (AR 25.) The ALJ reasonably concluded: "I find that if the issue of his alleged

flashbacks was severe enough to limit the claimant's ability to do work-related activities

that he would have previously spoken to his mental health counselor about the

flashbacks." (*Id.*)

Finally, as discussed throughout this Report and Recommendation and in the

ALJ's decision (AR 21-22), Johnson's softball-playing is well-documented in the record,

despite Johnson's claim that he did not play softball during the alleged disability period.

In his Reply, Johnson points out that, at the June 2010 administrative hearing, he testified

that he did not *play* softball in 2006, but rather merely coached it. (AR 60.) Specifically,

Johnson stated at the hearing: "The last time I played softball was the year I worked for

Dayco Installation in 2005. . . . In '06[,] I wasn't playing. I was coaching. Third base

coach." (*Id.*) Nonetheless, the record clearly reflects Johnson's contemporaneous

reporting to medical providers that he was *playing* softball during the alleged disability

period. (*See, e.g.,* AR 439 ("fell while playing softball today"), 466 ("enjoys playing

league Softball"), 484 ("is apparently a very active softball player" and "is a right-handed

pitcher"), 488 ("injured [ankle] playing softball"); *see also* AR 777 ("threw a wiffle ball

as hard as he could").) And one examining doctor even included a fairly detailed

description of Johnson's base-running in his treatment notes, stating: "Johnson rolled his

right ankle when he fell while playing softball today. He was caught between 2 bases

25

and as he was maneuvering to return or gain the next base, he rolled his ankle and fell."
(AR 439.)  It is possible that the medical providers misunderstood Johnson, or mis-
recorded his statements to them.[5]  Presumably, the ALJ considered these possibilities in
assessing Johnson's credibility, and the Court must defer to the ALJ on this issue.  *See
Aponte*, 728 F.2d at 591.

A review of the record reflects that, during the alleged disability period, although
Johnson experienced back pain, ankle and shoulder injuries, memory problems,
headaches, trouble sleeping, depression, and anxiety, his symptoms were generally mild
and effectively treated with medication, as demonstrated in his ability to care for his
young son, do some carpentry and other work, and play competitive softball and whiffle
ball.  "[D]isability requires more than mere inability to work without pain.  To be
disabling, pain must be so severe, by itself or in conjunction with other impairments, as to
preclude any substantial gainful employment."  *Dumas*, 712 F.2d at 1552.  The ALJ
applied the correct legal standard in assessing Johnson's credibility, and there is
substantial evidence in the record supporting that assessment as well as the ALJ's
ultimate decision that Johnson's impairments did not preclude him from performing any
substantial gainful employment during the alleged disability period.  Therefore, the ALJ's
decision should be upheld, even if substantial evidence supporting Johnson's position
also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is

---

[5]  Even if Johnson was merely coaching and not playing softball, the record reveals that there was
a level of physicality to Johnson's alleged coaching which was similar to that of actually playing softball.
(*See* AR 60.)  Furthermore, and as the ALJ properly recognized, Johnson's ability to either play or coach
softball supported a finding that he was not significantly limited in social functioning.  (AR 21-22 ("it is
apparent that the claimant takes part in the social activity of softball").)

substantial evidence to support either position, the determination is one to be made by the fact finder.").[6]

## Conclusion

For these reasons, I recommend that Johnson's motion (Doc. 12) be DENIED, and the Commissioner's motion (Doc. 16) be GRANTED.

Dated at Burlington, in the District of Vermont, this 31st day of October, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

---

[6] I am not persuaded by the arguments presented in Johnson's Reply regarding the Commissioner's omission of certain portions of the record in summarizing the "relevant facts." (*See* Doc. 19 at 1-2.) The record speaks for itself, and clearly, neither party is required to recite every fact contained therein, particularly in a case such as this which involves a record exceeding one thousand pages. Nor is the ALJ required to discuss every piece of evidence, particularly where, as here, the court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the ALJ's] determination was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982).